DECISION AND JUDGMENT ENTRY
This appeal comes to us from a judgment of conviction and imposition of sentence issued by the Lucas County Court of Common Pleas, following the return of a jury verdict which found appellant guilty of attempted felonious assault. Appellant's counsel has filed an Anders brief in this matter. Because we conclude that the proceedings in the trial court were free of prejudicial and constitutional error, we affirm.
Appellant, Roosevelt Kelly, was originally indicted on one count of aggravated robbery, a violation of R.C.2911.01(A) (3) and on one count of felonious assault, in violation of R.C. 2903.11(A) (1). The charges stemmed from a January 19, 1999 incident in which appellant allegedly demanded money from David and Brandy Scott, who are husband and wife. Prior to trial, the second count was amended to attempted felonious assault, in violation of R.C. 2923.02 and R.C. 2903.11(A) (1).
At trial, the Scotts testified that a black man in the company of several other men approached them as they were walking on a downtown Toledo street at approximately 8:00 p.m. The man referred to himself as "Rosie" or "Rose"; he wore "dreadlocks" and repeated several times that the Scotts knew him. The man demanded money. When the Scotts denied knowing him and failed to hand over any money, the man struck both victims several times with a twelve to fifteen inch long metal object. Mrs. Scott received two blows causing lacerations to the back of her head; the assault dazed her for a few seconds. Mr. Scott received blows to the neck and arms when he attempted to protect his wife. The other men allegedly encircled the victims and the assailant. They verbally incited him to continue the assault.
Mr. Scott finally took $50 from his pocket and handed it over to appellant. The assailant, nevertheless, struck him several more times. The victims then escaped to the municipal court building where they found Toledo police officers and reported the incident. They described the perpetrator, "Rose", as a heavyset black male with dreadlocks wearing a red ball cap with a gold insignia[1] and a dark navy blue or black hooded sweat shirt under a long dark jacket. The Scotts also identified one of the other men as a tall, skinny black male wearing a blue or black and yellow jacket.[2]
The Scotts testified that within a short time, police took them to a nearby street, where two suspects had been found and detained. Both victims positively identified appellant as the perpetrator; Mrs. Scott identified the second man as one of the men standing near appellant at the scene of the robbery. At trial, both victims again positively identified appellant as the attacker, even though he had no hair and was dressed in different clothing.
Three police officers also testified as to the events which occurred subsequent to the Scotts' initial report and the apprehension of appellant. Two of the officers testified that within ten minutes of being given the description and close to where the incident took place, they saw appellant with another man who generally fit the descriptions given by the Scotts. When the police turned around to stop them, one officer noted that the second man began walking quickly away from appellant. Police were, however, able to stop them and they were cooperative. No weapon or long metal object was found on either suspect. Appellant and the second man were then detained until the victims could be brought to the scene.
Two of the officers testified that when appellant removed his hat, Mr. Scott immediately identified him as the attacker. The officers corroborated that the Scotts identified both men as the men at the scene of the robbery. The officers also confirmed that at the time of the incident, appellant's hair was curly and longer (in a "unique" style) rather than bald, as he appeared at trial. The officer who had brought the victims to the scene stated that police had taken the Scotts to the hospital after the identification process and statements were completed at the station.
At this point, appellant moved for acquittal, which the court denied. Appellant then presented one witness, Larry Anderson, the other man with him at the time he was arrested. Anderson testified that he lives in the neighborhood near the alleged assault and has been good friends with appellant for approximately eight years. Anderson said that on the evening of the alleged assault, he and appellant had played pool at a neighborhood bar for forty-five minutes to an hour and then walked to another corner store to buy cigars. Anderson testified that he and appellant stood outside the store and smoked the cigars. According to Anderson, the two men were walking back home when police stopped them. Anderson denied that either man had been involved in the assault or robbery. He also stated that Rose had worn his hair in braids, not "dreadlocks."
At first, Anderson stated that he and appellant had been together the day before the incident and the entire time on the day leading up to when they were stopped by police. However, on cross-examination, Anderson became somewhat confused as to exactly what time he and appellant had started out together on the day of the incident. Anderson denied that he would lie for appellant, but also acknowledged that he would help him if possible. Anderson, who responded two hours late to his subpoena time, also said that he considered family issues more important than appearing for court matters.
On rebuttal, the state presented two witnesses. Detective Andre Woodson testified that he knew Anderson, who was the son of another Toledo police officer. Detective Woodson opined that Anderson had a reputation in the community for not telling the truth, even while under oath.
Detective Timothy Campbell, the officer who took the Scotts' formal statements at the police station, also testified. He noted that both victims' stories were consistent with each other as both described two men with only one committing the actual assault and robbery. Detective Campbell also stated that the Scotts said the assailant had pulled off his cap and called himself "Rose with the dreadlocks." Detective Campbell testified that the Scotts had also described the assailant's hair as having some type of braids. Detective Campbell identified appellant and testified that at the time of his arrest, appellant's hair matched the description given by the Scotts.
Detective Campbell also testified that at the time of arrest, after being Mirandized, appellant told him that just prior to being stopped by police he had been at a nearby apartment complex. The detective had also spoken with Larry Anderson; however, Anderson did not disclose the same story that he had related in court. Detective Campbell, who also knew Anderson as the son of a fellow police officer, also opined that Anderson has a bad reputation for truthfulness. At the close of the state's case, appellant again moved for acquittal. Once more, the motion was again denied.
The jury found appellant not guilty as to the aggravated robbery charge, but guilty as to the amended charge of attempted felonious assault. The court then sentenced appellant to a term of four years.
Pursuant to the guidelines established in Anders v.California (1967), 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493, counsel appointed for appellant's appeal has filed a brief and motion requesting withdrawal as appellate counsel. Counsel states that, after careful review of the record and legal research, he can discern no errors by the trial court prejudicial to the rights of the appellant which present issues meriting review.
Counsel argues two potential errors "that might arguably support the appeal." Anders, supra, at 744. Counsel further requests permission to withdraw as counsel for appellant on the basis that this case presents no issues meriting review. Counsel states that he has advised appellant of his right to file a brief on his own behalf and that a copy of both the brief and motion to withdraw have been served upon appellant. Appellant has filed no brief on his own behalf.
We are required, pursuant to Anders, supra, to thoroughly and independently review the record to determine that counsel has made a diligent effort to represent appellant and that the proceedings below were free from prejudicial error and conducted without infringement of appellant's constitutional rights.
Upon consideration, we conclude that counsel's brief is consistent with the requirements set forth in Anders, supra andPenson v. Ohio (1988), 488 U.S. 75, 109 S.Ct. 346,102 L.Ed.2d 300. Counsel for appellant sets forth the following two proposed assignments of error:
 "FIRST ASSIGNMENT OF ERROR: APPELLANT-DEFENDANT'S CONVICTION [SIC] AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 "SECOND ASSIGNMENT OF ERROR: THERE WAS JUDICIAL MISCONDUCT ON THE PART OF THE TRIAL JUDGE."
 I.
Counsel's first proposed assignment of error is that appellant's conviction was against the manifest weight of the evidence.
Under a manifest weight standard, an appellate court sits as a "thirteenth juror" and may disagree with the fact finder's resolution of the conflicting testimony. State v.Thompkins (1997), 78 Ohio St.3d 380, 387. The appellate court,
 "`reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" Id., quoting State v. Martin (1983), 20 Ohio App.3d 172, 175. Id. at 387; State v. Martin, supra.
Additionally, the reversal must be by concurrence of all three judges and the defendant is then granted a new trial. Thompkins,supra at 389.
In the present case, we have thoroughly reviewed the record and the testimony of the witnesses. Although some minor conflicts are present, the statements of the police officers and the victims are reasonably consistent throughout regarding the facts and identification of appellant. Therefore, we cannot say that the credibility of the two victims or the officers was suspect or that anything else in the record indicates that the jury clearly lost its way. Therefore, we conclude that the conviction was not against the manifest weight of the evidence.
Accordingly, counsel's first proposed assignment of error is without merit.
 II.
Counsel's second proposed assignment of error is that the trial court committed judicial misconduct. Counsel suggests possible impropriety because one of the jurors had previously lived on the same street as the judge and the judge commented that he had previously sentenced appellant on prior offenses.
We first note that an appellate court need not consider an error which could have been addressed or corrected if it had been called to the attention of the trial court but was not. Statev. William (1977), 51 Ohio St.2d 112, paragraph one of the syllabus. In this case, neither of the above alleged errors were called to the attention of the trial court. Thus, in order to consider these issues, we must examine them under the doctrine of "plain error." Plain error is an obvious error or defect in the trial court proceedings, affecting substantial rights, which, "but for the error, the outcome of the trial court clearly would have been otherwise." See Crim.R. 52(B); see State v. Underwood
(1983), 3 Ohio St.3d 12, 13; State v. Long (1978), 53 Ohio St.2d 91,94-95.
The standard of review concerning whether a prospective juror should be disqualified for cause is abuse of discretion.Berk v. Matthews (1990), 53 Ohio St.3d 161. Thus, the trial court's decision will be reversed only if it was unreasonable, arbitrary, or unconscionable. Blakemore v. Blakemore (1981),5 Ohio St.3d 217.
In this case, the record reveals that one of the jurors had a passing acquaintance with the trial judge because the two had resided on the same street at a previous time. The juror assured the court that she would be able to determine the issues without prejudice or bias and nothing in the record indicates otherwise. Therefore, we conclude that the trial court did nothing to prejudice appellant's case.
We will now address the issue of the trial court's prior involvement with appellant. Where a judge is biased or prejudiced against an appellant or has expressed a fixed opinion giving that impression, the judge should recuse himself from further participation in the matter so as to avoid the appearance of impropriety. See Columbus v. Pierce (1991), 77 Ohio App.3d 841,844; Cannon 3(C) (1) (a) of the Code of Judicial Conduct.
Again, upon a complete review of the proceedings, we can find no evidence which indicates that the trial court judge had a predisposition or prejudice against appellant. The court's comment at sentencing merely related to factors regarding appellant's risk for recidivism. Therefore, since we can find nothing in the record to indicate any judicial misconduct, we conclude that the proposed errors do not rise to the level of plain error.
Accordingly, counsel's second proposed assignment of error is without merit.
We conclude, therefore, that this case presents no arguable issues meriting review; we further determine this appeal to be without merit and wholly frivolous. Appellate counsel's motion to withdraw is granted.
The judgment of the Lucas County Court of Common Pleas is affirmed. Court costs of this appeal are assessed to appellant.
JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
MELVIN L. RESNICK, J.
 _______________________________ JUDGE
 JAMES R. SHERCK, J.
 _______________________________ JUDGE
 MARK L. PIETRYKOWSKI, J.
 _______________________________ JUDGE
CONCUR.
[1] At trial, Mr. Scott described the insignia as "gold;" a police officer testified that it had been described as white. The hat appellant was wearing which was admitted as an exhibit was red with a gold insignia.
[2] At the time of trial, Mrs. Scott said "black and yellow" and Mr. Scott could not remember what the second individual was wearing. However, at the time of the incident, the Scotts described the second man as wearing a "blue and yellow" jacket.